# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| CECIL TURNER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 10-cv-1140 |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## O P I N I O N  &  O R D E R

Before the Court is Petitioner Cecil Turner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (R.2 Doc. 1)[1] as well as Petitioner's Motion to Amend his § 2255 Motion (R.2 Doc. 8). The Government has filed a Memorandum in Opposition to Petitioner's Motion to Vacate (R.2 Doc. 12), to which Petitioner has filed a Response (R.2 Doc. 15). For the following reasons, Petitioner's Motion to Vacate is GRANTED in part and DENIED in part.

### BACKGROUND[2]

Petitioner was the Director of the Division of Physical Services for the Illinois Secretary of State's office from 1999 to 2005. In this position, he supervised over 300 employees who were responsible for cleaning and maintaining various state-

---

[1] The Court will cite to the record of Petitioner's instant habeas action, 10-cv-1140, as (R.2 Doc. __); and to the record of Petitioner's underlying criminal proceedings, 06-cv-30012, as (R.1 Doc. __).
[2] The following factual background is taken from the opinion of the United States Court of Appeals for the Seventh Circuit on Petitioner's direct appeal. *United States v. Turner*, 551 F.3d 657 (7th Cir. 2008).

owned buildings in Springfield, Illinois. Three of those employees were the night janitors, Dana Dinora, David Medvesek, and Steven Boyce. Petitioner promoted Dinora to lead janitor shortly after being appointed Director in 1999, and the three janitors comprised a cleaning crew responsible for several state-owned buildings.

Led by Dinora, the three night janitors devised a scheme to take massive amounts of unauthorized leave without being detected by their supervisors. At its peak, the scheme allowed Dinora to collect a full salary while working less than 30 minutes each day and the others to receive full pay while cutting their work hours in half. Petitioner was essential to the success of the scheme. Petitioner repeatedly intervened when the janitors' immediate supervisors began to watch the three more closely, reprimanding them and telling them to leave Dinora and his crew alone.

Petitioner's efforts to deflect attention from the night janitors' fraud were successful from 1999 until 2003, when Division Chief Dodie Stannard became involved. Stannard began to investigate after receiving numerous complaints about the unsanitary conditions in the buildings that Dinora's crew was assigned to clean. Stannard would check the buildings when the janitors were supposed to be working, and often found them deserted. Accordingly, Stannard made a written report about her investigation to Petitioner and recommended that the Office of the Inspector General ("OIG") become involved. Petitioner responded by claiming that Stannard had "stabbed him in the back" by putting her concerns in writing, and told her that reporting Dinora's crew to the OIG was unnecessary as the matter rested with him alone.

In mid-2005, Stannard notified the OIG of her concerns. Petitioner was informed of the report by the OIG, and told not to disclose it to anyone. Nevertheless, Petitioner warned Dinora of the investigation and told him to watch his crew closely. Thereafter, in September 2005, the FBI opened an investigation and Dinora began cooperating, making Petitioner the focus of the investigation. In mid-October, FBI agents questioned Petitioner about the janitors' scheme. Petitioner stated that he had never aided the janitors in their scheme, that he did not know of it until September 2005, and that he had complied with the OIG's request not to tell anyone about the investigation. The FBI questioned Petitioner again in November 2005, and Petitioner stuck to his story.

On September 8, 2006, Petitioner, along with Dinora, Medvesek, and Boyce, was charged by amended indictment with four counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 2 (Counts I-IV). (R.1 Doc. 1 at 1-15). Petitioner was also charged with two counts of making false statements, in violation of 18 U.S.C. § 1001 (Counts V-VI). (R.1 Doc. 1 at 17-21). On August 24, 2006, Medvesek and Boyce pled guilty. (R.1 Minute Entries of 8/24/06). On August 25, 2006, Dinora pled guilty. (R.1 Minute Entry of 8/25/06). Petitioner proceeded to trial on September 11, 2006. Following a five day jury trial, Petitioner was convicted on all six counts of the indictment on September 18, 2006. (R.1 Doc. 77).

After Petitioner was convicted, a Presentence Report ("PSR") was completed by the U.S. Probation Office. (R.1 Doc. 89). In the PSR, Petitioner's base offense level was calculated at 7 (R1. Doc. 89 ¶ 48); his offense level was increased by 10

levels as the amount of loss was more than $120,000 (R.1 Doc. 89 ¶ 49); he received a two point enhancement for his role in the offense as "the defendant abused a position of trust and his position as Director of Physical Services helped him conceal the offense" (R.1 Doc. 89 ¶ 41); and he received a two level enhancement for obstruction of justice in that he was convicted of Making False Statements (R.1 Doc. 89 ¶ 52), resulting in an adjusted total offense level of 21 (R.1 Doc. 89 ¶ 53). The PSR established a Sentencing Guideline range of 37 to 46 months. (R.1 Doc. 89 ¶ 101). On January 4, 2007, this Court departed downward from the Guideline range and sentenced Petitioner to 30 months imprisonment on each of Counts I-VI, to run concurrently; three years of supervised release on each of Counts I-VI, to run concurrently; $600 in special assessments and restitution in the amount of $49,558.87. (R.1 Doc. 92).

Petitioner filed a notice of appeal on January 8, 2007. (R.1 Doc. 94). On appeal, Petitioner argued: (1) that the evidence at trial was insufficient to convict him of making false statements in violation of 18 U.S.C. § 1001; (2) that the evidence at trial was insufficient to establish an honest services fraud because he received no private gain as a result of his participation in the fraudulent scheme; and (3) that the use of the wires was not "in furtherance of" the fraudulent scheme. *United States v. Turner*, 551 F.3d 657 (7th Cir. 2009). On December 30, 2008, the United States Court of Appeals for the Seventh Circuit Court affirmed this Court on each issue. *Id.*

4

On May 14, 2010, Petitioner filed the instant § 2255 Motion to Vacate, Set Aside, or Correct Sentence, in which he raised five grounds for relief: (1) in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution failed to disclose an FBI investigation into Dodie Stannard, a witness at his trial; (2) he was selectively prosecuted because of his political affiliation; (3) his attorney provided ineffective assistance by failing to present impeachment evidence against Stannard; (4) this Court was without jurisdiction to try him; and (5) his sentence was excessive because his attorney failed to challenge the PSR. (Docs. 1 & 2). The Court dismissed Petitioner's claim that it was without jurisdiction to try him, and ordered the Government to respond to the remainder of Petitioner's Motion. (Doc. 4). On July 13, 2010, before the Government responded, Petitioner filed a Motion to Amend his § 2255 Petition, in which he raised the additional argument that his wire fraud conviction should be vacated in light of the Supreme Court's decision in *Skilling v. United States*, 130 S.Ct. 2896 (2010). The Government filed its Memorandum in Opposition to Petitioner's § 2255 Motion on September 2, 2010 (Doc. 12), and Petitioner filed his Response on October 15, 2010 (Doc. 15).

## DISCUSSION

Section 2255 of Title 28 of the United States Code permits a person in custody to challenge his sentence on the basis that 1) it was imposed in violation of the Constitution or laws of the United States, 2) the Court lacked jurisdiction to impose such sentence, 3) the sentence was in excess of the maximum authorized by

5

law, or 4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a); *United States v. Carraway*, 478 F.3d 845, 848 (7th Cir. 2007).

The Seventh Circuit Court of Appeals has held that "the grant of a habeas writ is intended to be the exception, not the rule." *United States v. Kovic*, 830 F.2d 680, 683 (7th Cir. 1987). "Relief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). Thus, § 2255 is limited to correcting errors of constitutional or jurisdictional magnitude or errors constituting a fundamental defect that results in a complete miscarriage of justice. *Kelly v. United States*, 29 F.3d 1107, 1112 (7th Cir. 1994).

A § 2255 petition is not a substitute for a direct appeal. *Doe v. United States*, 51 F.3d 693, 698 (7th Cir. 1995). "An issue not raised on direct appeal is barred from collateral review absent a showing of both good cause for and actual prejudice resulting from the failure to raise it." *Mankarious v. United States*, 282 F.3d 940 (7th Cir. 2002). A showing of ineffective assistance of counsel can satisfy the "cause" requirement for a § 2255 motion. For claims of ineffective counsel, the Supreme Court established a two-prong test in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail, Petitioner must establish that (1) counsel's representation fell below the threshold of objective reasonableness, and (2) but for counsel's deficiency, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Id.* at 687, 694. In evaluating counsel's

representation, the court must give great deference to the attorney's performance, due to the distorting effects of hindsight. *Id.* at 687.

### A. The Government's Failure to Disclose the FBI Investigation of Dodie Stannard

Petitioner first alleges that the Government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose prior to trial that one of its witnesses, Dodie Stannard, was under investigation by the FBI. On August 29, 2005, Petitioner notified the OIG that Stannard was providing her neighbor confidential information regarding bidding for cleaning supplies. (R.2 Doc. 15 at 9). At some point, the FBI joined in the OIG's ensuing investigation, and on October 13, 2005, FBI agents discussed the matter with Petitioner while they were also questioning him concerning his role in the night janitors' scheme. (R.2 Doc. 15 at 6). According to the Government, the OIG and the FBI concluded their investigations of Stannard on May 15, 2006, finding all of Petitioner's allegations to be without merit. (R.2 Doc. 12 at 12). Nevertheless, Petitioner maintains that the defense may have used evidence of the FBI's investigation to impeach Stannard's credibility, and that Stannard's testimony was crucial to the Government's case against him. (R.2 Doc. 15 at 4-7).

"In order to mount a successful *Brady* challenge, a [petitioner] must establish the following: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995). To be material, the evidence must be such that there is a "reasonable probability" that had it been

7

disclosed, the outcome of the trial would have been different. *Id.* In other words, it must be such that its suppression "undermines confidence in the outcome of the trial," in light of the full context of the weight and credibility of all the evidence actually presented at the trial. *Id.* The same standard applies to the suppression of impeachment evidence. That is, the suppression of impeaching evidence "amounts to a constitutional violation only if it deprives the defendant of a fair trial . . . in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).

The Government maintains that it did not commit a *Brady* violation in this case for several reasons: 1) it did, in fact, provide Petitioner and his attorneys with discovery indicating that Stannard had been investigated by the FBI; 2) the FBI investigation of Stannard had concluded prior to trial with a finding that the allegations against her were unfounded, such that the evidence would not have been admissible or material at trial regardless of its disclosure; and 3) substantial evidence of Petitioner's guilt existed in addition to Stannard's testimony, such that the allegedly suppressed evidence is not material. (R.2 Doc. 12 at 9-13). The Court agrees with the Government that even if the prosecution did suppress evidence of the FBI investigation into Stannard, it would not result in a *Brady* violation because it was not material to outcome of the trial.[3]

---

[3] The parties dispute whether or not discovery was produced as to the FBI investigation of Stannard. As both parties cite to evidence that is not in the record to support their arguments, and the question need not be reached, the Court declines to address it herein.

At Petitioner's trial, not only Stannard, but three of the janitor's other supervisors—Randy Lewis, James "Bo" Carter, and Harry Fanning—testified that whenever they reported that Dinora and his crew were not at work when they should have been, Petitioner ordered them to quit checking on Dinora and his crew, reprimanded them, or relieved them of their duties. (R.1 Doc. 47 at 110-211).

James Carter testified that he was "night liaison" from approximately 1996 until December 2002. (R.1 Doc. 147 at 141). In this position, he was responsible for checking on all the state-owned buildings and night janitors to make sure all work was being completed. (R.1 Doc. 147 at 141). Carter testified that in 2001, he called Dinora to his office and told him that him and his crew were going to need to start staying at work and working in their assigned buildings. (R.1 Doc. 147 at 146). Several days later, Carter's boss told him to stay away from Dinora's buildings. He said that this message came from Petitioner. (R.1 Doc. 147 at 147). In the summer of 2002, Carter was driving by one of Dinora's buildings around 8:00 at night and saw Dinora arriving at the building. (R.1 Doc. 147 at 148). The next day, Carter was called into Petitioner's office, and Petitioner told him to "stay the hell away from over there and leave them alone." (R.1 Doc. 147 at 148-49). Carter never checked on Dinora's crew again. (R.1 Doc. 147 at 149).

Harry Fanning replaced Carter as night liaison in January 2003. He testified that, shortly after he began in this position, he discovered that Dinora and his crew were not working in their assigned buildings when they were supposed to be. (R.1 Doc. 47 at 118-120). After he reported this incident to Stannard, who was

9

his boss, Fanning was called into Petitioner's office. (R.1 Doc. 47 at 123-124). Petitioner yelled at Fanning and told him that "Whatever goes on in that building is none of your concern" and that he should "leave my guys alone." (R.1 Doc. 47 at 124). Fanning testified that as a result of this altercation, he did not check on Dinora and his crew again until August of 2005. (R.1 Doc. 147 at 125).

Finally Randy Lewis testified that he was an operation office supervisor in 1998 and 1999. (R.1 Doc. 147 at 163). In this position he supervised Dinora. (R.1 Doc. 147 at 163). Because he was having attendance problems with Dinora, Lewis testified that he had Dinora placed on proof status in March of 1999. (R.1 Doc. 147 at 165-69). Approximately five days later, Lewis was called into a meeting with Petitioner. (R.1 Doc. 147 at 171). Petitioner was upset that Dinora had been placed on proof status, and conveyed this to Lewis. (R.1 Doc. 147 at 172). Shortly thereafter, Lewis was removed from the buildings at which Dinora worked, at the direction of Petitioner. (R.1 Doc. 147 at 173-74). When Lewis was placed back onto those buildings in 2000, Petitioner told him to stay away from them; accordingly Lewis did not monitor Dinora and his crew the way he monitored the other janitors. (R.1 Doc. 147 at 177-78).

In addition to this testimony concerning Petitioner's role in the janitors' scheme, Dinora also testified against Petitioner at trial. In addition to describing other interactions with Petitioner where Petitioner helped him and his crew, Dinora testified that 1) when he was upset about Randy Lewis he complained to Petitioner and Petitioner said "he would take care of it;" (R.1 Doc. 148 at 246); 2) when he

noticed Carter watching him and his crew he reported it to Petitioner and asked him to get Carter off their backs, and Petitioner responded that he would "handle it;" (R.1 Doc. 148 at 252); and 3) after Fanning reported the incident in January 2003, Dinora talked to Petitioner and Petitioner told him that he would call Fanning into his office and talk to him (R.1 Doc. 148 at 254). The Government also played recordings of conversations between Petitioner and Dinora, indicating that Petitioner was involved in aiding Dinora and his crew to get away with their scheme.

Accordingly, even if the prosecution did suppress evidence that would go to Stannard's credibility, the Court cannot find that there is a "reasonable probability" that had it been disclosed, the outcome of the trial would have been different. *Silva*, 71 F.3d at 670. In light of the full context of the weight and credibility of all the evidence actually presented at the trial, the Court is confident that even had evidence of the investigation into Stannard been revealed, the outcome would have been the same. *See id.*[4] Therefore, Petitioner's first claim for relief based upon an alleged *Brady* violation is denied.

### B. Selective Prosecution

Petitioner next contends that the Government selectively prosecuted him because of his political affiliation and race. (R.2 Doc. 15 at 7). He argues that the

---

[4] Moreover, Petitioner was certainly aware of the OIG's investigation of Stannard (as he himself had initiated it), and his trial counsel made the professional decision not to bring this matter up at trial. While Petitioner claims that it was ineffective assistance of counsel for him not to do so, as the Court will discuss below, this claim is without merit. Accordingly, evidence of a parallel investigation into Stannard's conduct which proved non-meritorious is not sufficient to undermine the Court's confidence in the outcome of the trial.

janitors involved in the scheme, who were all white, entered into plea agreements with the Government and were given more favorable treatment than him, and that many of the of the witnesses against him were biased due to political and racial differences. (R.2 Doc. 15 at 8).

To make a *prima facie* case of selective prosecution, Petitioner must show that: (1) he was singled out for prosecution while other violators similarly situated were not prosecuted; and (2) the decision to prosecute was based on an arbitrary classification such as race, religion, or the exercise of constitutional rights. *United States v. Cyprian*, 23 F.3d 1189, 1195 (7th Cir. 1994). To establish selective prosecution on an arbitrary classification, Petitioner must demonstrate that the prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). "To obtain an evidentiary hearing, the factual basis for these claims must be more than colorable. In other words, [Petitioner] must proffer 'sufficient evidence to raise a reasonable doubt that the government acted properly in seeking the indictment.'" *Cyprian*, 23 F.3d at 1195 (quoting *United States v. Benson*, 941 F.2d 598, 611 (7th Cir. 1991)).

Petitioner has not succeeded in presenting a *prima facie* case of selective prosecution. While Petitioner claims that the "scheme of ghost payrolling wasn't new and was in existence prior to the hiring of [Petitioner] as Director of Physical Services," and that "the chain of command that allowed this scheme to flourish went below and much higher than [Petitioner]," he provides no factual support for these

statements. (Doc. 15 at 7). Moreover, the fact that the white janitors received more favorable treatment because they pled guilty is not a basis for a claim of selective prosecution. All four men were in fact indicted and prosecuted. The only difference between Petitioner's situation and theirs is that the other three men chose to accept responsibility and cooperate. The fact that their cooperation and acceptance of responsibility was taken into account in the punishment they received is not improper. *See United States v. Hall*, 212 F.3d 1016, 1020 (7th Cir. 2000). Accordingly, Petitioner's claim of selective prosecution is denied.

### C. Ineffective Assistance of Counsel

Petitioner also claims that he received ineffective assistance of counsel at trial and during sentencing. As previously mentioned, in order to succeed on a claim for ineffective assistance of counsel, Petitioner must establish that (1) counsel's representation fell below the threshold of objective reasonableness, and (2) but for counsel's deficiency, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Id.* at 687, 694.

#### a. Failure to Cross-Examine Stannard

Petitioner first argues that his trial counsel was ineffective for failing to cross-examine Stannard regarding the OIG's investigation of her for bid-rigging. As previously mentioned, Petitioner reported Stannard to the OIG on August 29, 2005 for allegedly tipping off her neighbor as to bidding on cleaning supplies. In May of 2006, four months prior to Petitioner's trial, the OIG concluded its investigation and found that all of Petitioner's allegations were non-meritorious. (Doc. 12 at 12).

13

Petitioner argues that his attorney should have cross-examined Stannard regarding this investigation because it would have displayed her bias against Petitioner and her motivation to submit perjured testimony. (R.2 Doc. 15 at 9-10).

The Court does not find that Petitioner's attorney's failure to question Stannard regarding the investigation fell below the objective standard of reasonableness. The investigation into Stannard had concluded four months before trial with a finding that Petitioner's allegations against her were unfounded. (R.2 Doc. 12 at 16). Accordingly, Stannard had no motivation to perjure herself at Petitioner's trial in order to curry Government favor. Moreover, even if such questioning could have shown the jury that Stannard had a bias against Petitioner as Petitioner was the one who brought the initial complaint against her, it could have also cut the opposite way and detracted from Petitioner's credibility because he had made a non-meritorious complaint to the OIG against a person who was causing him difficulties. This is especially true because, based upon the factual timeline, Petitioner did not lodge his complaint with the OIG until *after* Stannard had begun looking into the janitors' conduct and had written up a report detailing her findings. Therefore, Petitioner's attorney's decision to keep this evidence out of trial was not unreasonable, and therefore Petitioner's first claim for ineffective assistance of counsel is denied.

### b. Failure to Object to PSR

Petitioner's second claim for ineffective assistance of counsel is premised upon his attorney's failure to object to the PSR, specifically the aggravating factor of

Petitioner's role in the janitors' scheme. (R.2 Doc. 15 at 11-13). The PSR reflects a two level increase in Petitioner's offense level for Petitioner's role in the offense, "as the [Petitioner] abused a position of public trust and his position as Director of Physical Services helped him conceal the offense." (R.1 Doc. 89 ¶ 51). Petitioner maintains that the Government presented insufficient evidence of his role in the offense at trial and that therefore his attorney was ineffective for failing to object to this two-level increase. (R.2 Doc. 15 at 11-13). According to Petitioner, the only evidence of his role in the offense came from the biased and prejudicial testimony of Doddie Stannard. (R.2 Doc. 15 at 12).

The Court disagrees. As previously discussed, in addition to Stannard's testimony, three other supervisors testified that when they attempted to monitor Dinora's crew Turner told him to leave them alone. In addition, the Government presented audio-taped conversations between Petitioner and Dinora demonstrating Petitioner's role in the offense, and Dinora himself testified to this effect. Based upon all of this evidence, it was not unreasonable for Petitioner's attorney to not object to the two-level enhancement. *See Rodriguez v. United States*, 286 F.3d 972, 985 (7th Cir. 2002) (holding that it was not unreasonable for an attorney to fail to raise an argument that was likely to fail). Moreover, Petitioner was not prejudiced by his attorney's failure to object, as the evidence at trial was sufficient to warrant the enhancement. Accordingly, Petitioner's second claim for ineffective counsel is also denied.

### D. Effect of *Skilling* Upon Petitioner's Conviction

Following the filing of his initial Motion to Vacate, Petitioner amended his § 2255 Motion to include a claim that his conviction and sentences for wire fraud should be vacated pursuant to the Supreme Court decision of *Skilling v. United States*, 130 S.Ct. 2896 (2010). The Government concedes that *Skilling* applies retroactively to Petitioner's conviction and sentence. (R.2 Doc. 12 at 19). However, the Government contends that an application of *Skilling* does not require Petitioner's wire fraud convictions to be vacated because the conviction rested upon proper grounds, and not upon an honest services theory which was discredited by *Skilling*.

The wire fraud statute, 18 U.S.C. § 1343, makes it a crime to use the interstate wires in "any scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." To convict a defendant of wire fraud, the Government must prove three elements: (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) the use of an interstate wire in furtherance of the fraudulent scheme. *Turner*, 551 F.3d at 664 (*citing United States v. Radziszewski*, 474 F.3d 480, 484-85 (7th Cir. 2007)). Section 1346 of Title 28 provides that a "scheme to defraud" may include a scheme to deprive another of the intangible right of honest services. 18 U.S.C. § 1346.

In *Skilling*, the Supreme Court narrowed the scope of the honest services fraud statute to include only cases involving bribes or kickbacks. 130 S.Ct. at 2931. It is undisputed that Petitioner was not alleged to have received any form of bribe or kickback in this case. *See Turner*, 551 F.3d at 665 ("There is no evidence that [Petitioner] received kickbacks or otherwise personally profited from the janitors' inflated salaries."). Accordingly, if Petitioner's conviction rested upon an honest services theory alone, there would be no doubt that it must be vacated. However, the Government points to language in the jury instructions which required the jury to find that Petitioner committed monetary wire fraud before convicting him of honest services fraud. Upon a review of Petitioner's criminal case record, the Court finds this argument to be unavailing.

Petitioner was charged four counts of wire fraud in violation of 18 U.S.C. §§ 1343, 1346 and 2. At trial, the Government's wire fraud theory was that Petitioner either aided and abetted the night janitors' fraudulent scheme or deprived the State of Illinois of his honest services. *Turner*, 551 F.3d at 661. The relevant Jury Instructions were as follows:

"To sustain the charge of wire fraud, the Government must prove the following propositions:

> First, that the defendant knowingly participated in this scheme to defraud or to obtain money or property by means of false pretenses, representations or promises, *or that the defendant participated in a scheme to defraud the State of Illinois of the defendant's honest services* as described in Counts I through IV of the indictment.

Second, that the defendant did so knowingly and with the intent to defraud.

And third, that for the purpose of carrying out the scheme, or attempting to do so, the defendant cased interstate wire communications to take place in a manner charged in the particular count.

If you find from your consideration of all of the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty." (R.1 Doc. 157 at 10-11 (emphasis added)).

The jury was also separately instructed as to the Government's honest services fraud theory:

"One way in which it is alleged that the defendant violated the wire fraud statute is by defrauding the Secretary of State's Office and the State of Illinois of its honest service. In this regard the Government must prove that the defendant's conduct breached a duty respecting the services owed to the Secretary of State Office and the State of Illinois. Stated another way, honest services contemplates that in rendering some particular service or services, the defendant was conscious of the fact that his actions were something less than in the best interest of the state. . . . *In addition to all of the elements of the wire fraud violation*, it must be established beyond a reasonable doubt that the defendant's misuse of his position resulted in private gain." (R.1 Doc. 157 at 11-12 (emphasis added)).

Based upon this second jury instruction, the Government argues that the jury could not have convicted Petitioner under an honest services theory without first finding that he committed all of the acts necessary to support a guilty verdict for the monetary wire fraud. (R.2 Doc. 12 at 22). However, as Petitioner correctly points out in his Response, the jury instruction as to monetary wire fraud also incorporated the alternative theory of honest services fraud as a method for proving a scheme to defraud. As such, the Court cannot determine whether or not the jury's verdict was based upon a monetary scheme to defraud or rather the now legally improper ground of honest services fraud, and therefore Petitioner's wire fraud

convictions must be vacated. *See United States v. Colvin*, 353 F.3d 569, 576-77 (7th Cir. 2003) (*citing Yates v. United States*, 354 U.S. 298, 312 (1957) ("[A] verdict [must be] set aside in cases where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury selected)).[5]

The Seventh Circuit's opinion on Petitioner's direct appeal is not to the contrary. On appeal, Petitioner argued that his wire fraud convictions must be vacated because the Government's evidence of an honest services fraud was insufficient. *Turner*, 551 F.3d at 664. The Seventh Circuit rejected Petitioner's argument, finding that even if the evidence of an honest services fraud was insufficient, because the evidence at trial was sufficient to establish that Petitioner aided and abetted a straight forward money or property fraud, his wire-fraud convictions could stand on that basis. *Id.* at 665-66. However, in so finding, the Seventh Circuit recognized that its alternative-basis-analysis was only proper because Petitioner was challenging the factual sufficiency of his conviction, rather than the legal sufficiency. *Id.* ("Although reversal is generally required when on a general verdict only one of two bases for the conviction is *legally* sound, the same is not true when the issue is factual, not legal, sufficiency." (internal citations omitted)). As Petitioner is now challenging the legal sufficiency of his conviction, the Court cannot rest upon the proper theory of a straightforward monetary fraud

---

[5] While Petitioner's wire fraud convictions are hereby vacated, the Court notes that Petitioner was also properly convicted of two counts of making false statements, for which his three year sentence, which he has already served, was to run concurrently. Moreover, the Court need not reach the issue of whether or not the imposed restitution was erroneous because a Petitioner cannot challenge a restitution order pursuant to § 2255. *Barnickel v. United States*, 113 F.3d 704, 706 (7th Cir. 1997).

19

absent indication that this was the basis upon which the jury convicted Petitioner. For the reasons previously discussed, the Court cannot find that the jury's general verdict was based upon the Government's monetary-fraud theory rather than its honest services theory, and therefore the wire fraud convictions must be vacated.

## CONCLUSION

For the foregoing reasons, Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (R.2 Doc. 1) is GRANTED in part and DENIED in part. It is GRANTED to the extent that Petitioner's wire fraud convictions under Counts I-IV of the Amended Indictment in case number 06-cr-30012 are hereby VACATED. It is DENIED in all other respects. IT IS SO ORDERED.

CASE TERMINATED.

Entered this <u>31st</u> day of August, 2011.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
